**26-1067 (Consolidated with 26-1264)**

**UNITED STATES COURT OF APPEALS**

**FOR THE SEVENTH CIRCUIT**

ROBERTINO PRESTA, ET AL.,

Petitioners – Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE

Respondent – Appellee

Appeal from the United States Tax Court

Docket Nos. 10703-19 and 10704-19

Honorable Judge Holmes

# REPLY BRIEF OF PETITIONERS – APPELLANTS,

# ROBERTINO PRESTA AND ANTONELLA PRESTA & CFM INSURANCE, INC.

Kacie N.C. Dillon
7033 E. Greenway Parkway
Suite 200
Scottsdale, AZ 85254
Phone: (480) 429-3360
Facsimile: (480) 429-3362
Counsel for Appellants

Brian D. Plaut
7676 Hazard Center Drive
Suite 1525
San Diego, CA 92108
Phone: (619) 387-3790
Facsimile: (480) 429-3362
Counsel for Appellants

**TABLE OF CONTENTS**


STATEMENT OF THE CASE....................................................................1

I. Formation and Oversight of CFM....................................................1

II. Insurance Coverage and Actuarially Determined Premiums................2

III. Risk Distribution..............................................................................2

ARGUMENT............................................................................................2

I. The McCarran-Ferguson Act is Applicable.........................................2

II. The Tax Court Erred in Finding the Transaction Is Not Insurance.......4

A. Appellee Has Failed to Show Clear Error..........................................4

B. The Tax Court's "Commonly Accepted Sense" Analysis Does Not Comport with the Seventh Circuit......................................5

C. The Tax Court Correctly Determined the Premiums were Actuarially Determined.........................................................10

III. The Tax Court Did Not Clearly Err in Finding CFM Adequately Distributed Its Risks.........................................................14

A. The Tax Court Did Not Place the Burden of Proof on the IRS 14

B. The Tax Court Did Not Clearly Err in Determining the Number of Exposure Units.........................................................15

C. The Tax Court Did Not Clearly Err in Determining the Risks were Sufficiently Independent...............................................17

IV. The Tax Court Incorrectly Refused to Recharacterize the Premiums as Capital Contributions or Loss Reserves/Deposit...............................18

A. The Form of the Transaction Allows for a Finding to Avoid Double Taxation.........................................................19

B. Insurance Premiums that are Deemed Not Insurance are Capital Contributions or Loss Reserves/Deposit.................................21

C. The Tax Court Did Not Find the Transaction Lacked Economic Substance, But Such a Finding Would Provide a More Favorable Result to Appellants ....26

CONCLUSION ....27

CERTIFICATE OF COMPLIANCE ....29

## TABLE OF AUTHORITIES

### CASES

*Anderson v. City of Bessemer City, N.C.*
470 U.S. 564 (1985) .......... 4

*Arrowhead Mountain Getaway, Ltd. v. Commissioner*
T.C. Memo. 1995-54 .......... 27

*Bank of N.Y. Mellon Corp. v. Commissioner*
T.C. Memo. 2013-225 .......... 27

*Bituminous Cas. Corp. v. Commissioner*
57 T.C. 58 (1971) .......... 21

*Blodgett v. Commissioner*
394 F.3d 1030 (8th Cir. 2005) .......... 14

*Caylor Land & Development, Inc. v. Commissioner*
T.C. Memo. 2021-30 .......... 12

*Chapman Glen Ltd. v. Commissioner*
140 T.C. 294 (2013) .......... 21, 25

*Complex Media, Inc. v. Commissioner*
T.C. Memo. 2021-14 .......... 19

*Early v. Lawyers Title Ins. Corp.*
132 F.2d 42 (4th Cir. 1942) .......... 21

*Estate of Stuller v. United States*
811 F.3d 890 (7th Cir. 2016) .......... 20

*Humana Inc. v. Commissioner*
881 F.2d 247 (6th Cir. 1989) .......... 22

*Indus. Life Ins. Co. v. United States*
344 F. Supp. 870 (D.S.C. 1972), aff'd 481 F.2d 609 (4th Cir. 1973) .......... 2, 3

*Knudsen v. Commissioner*
131 T.C. 185 (2008) .......... 15

*Kohler Co. v. United States*
468 F.3d 1032 (7th Cir. 2006)....................22

*Massachusetts Protective Ass'n v. United States*
114 F.2d 304 (1940)....................20

*Mobil Oil Corp. v. United States*
8 Cl. Ct. 555 (1985)....................22

*Pittsburgh Milk Co. v. Commissioner*
26 T.C. 707 (1956)....................23

*R.V.I. Guaranty Co. & Subsidiaries v. Commissioner*
145 T.C. 209 (2015)....................17

*Rent-A-Center v. Commissioner*
142 T.C. 1 (2014)....................12

*Reserve Mech. Corp. v. Commissioner*
T.C. Memo. 2018-86, aff'd 34 F.4th 881 (10th Cir. 2022)....................21, 22

*Sears, Roebuck & Co. v. Commissioner*
972 F.2d 858 (7th Cir. 1992)....................5

*Sharp v. Commissioner*
75 T.C. 32 (1980)....................19

*Sheldon v. Commissioner*
94 T.C. 738 (1990)....................27

*Spring Canyon Coal v. Commissioner*
43 F.2d 78 (10th Cir. 1930)....................22

*Stearns-Roger Corp. v. United States*
774 F.2d 414 (10th Cir. 1985)....................22

*Steere Tank Lines, Inc. v. United States*
577 F.2d 279 (5th Cir. 1978)....................22

*Syzygy Ins. Co. v. Commissioner*
T.C. Memo. 2019-34....................21

*United Ben. Life Ins. Co. v. McCrory*
414 F.2d 928 (8th Cir. 1969)....................21

*United States v. United States Gypsum Co.*
333 U.S. 364 (1948)....................4

*Whitehouse Hotel Ltd. P'ship v. Commissioner*
615 F.3d 321 (5th Cir. 2010)....................15

*Whitsett v. Commissioner*
T.C. Memo. 2017-100....................26

**STATUTES**

26 U.S.C. § 61....................24

26 U.S.C. § 183....................20

26 U.S.C. § 816(a)....................3

26 U.S.C. § 831(b)....................10

26 U.S.C. § 831(c)....................3

26 U.S.C. § 7491(a)(1)....................14

**RULES**

Fed. R. Civ. P. 52(a)....................4

Tax Court Rule 50(f)....................26

Tax Court Rule 142(a)(1)....................14

**OTHER AUTHORITIES**

Rev. Rul. 2005-40, 2005-27 I.R.B. 4....................20, 22

Rev. Rul. 2008-8, 2008-5 I.R.B. 340....................22

Hearings before the Committee on Ways and Means on the Revenue Act of 1918,
65th Cong., 2d Sess. Pt. 1 (1918)....................21

## STATEMENT OF THE CASE

In addition to the facts included in Appellants' opening brief, Appellants provide the following additional facts supporting the arguments addressed below. Appellants incorporate herein all the arguments and proposed findings from their Opening Brief. Any failure to address issues presented in Appellee's Answering Brief is not a concession or abandonment of those issues but simply recognizes that the issues are adequately covered in Appellants' Opening Brief, are not supported by the evidentiary records, or are not relevant to any issue before the Court.

### I. Formation and Oversight of CFM

Caputo's New Farm ("Caputo's") engaged the services of Artex Risk Solutions ("Artex") to form and manage its captive insurance operations. Ex. 297-J. Artex is a division of Arthur J. Gallagher ("Gallagher"), which is a highly respected brokerage and risk management firm. Second Stip. ¶¶ 180-182, Ex. 284-J, p. 1, Tr. 742:20-23. Caputo's oversaw the management of CFM through various meetings throughout the years. Tr. 313:15-314:15, 975:25-976:7; Exs. 540-539-J - 542-J, 554-J-550-J, 552-J – 555-J, 557-J-560-J, 565-J – 569-J. Significant due diligence was conducted before the formation of CFM through the review of documents, discussions, and a site visit. Tr. 971:24-974:14, 745:7-22, 741:12-743:1, 804:9-15, 1638:18-1639:12, Exs. 250-J, 252-J – 255-J, 308-J.

## II. Insurance Coverage and Actuarially Determined Premiums

The need for various coverages, including covering gaps in the commercial coverage for product recall was confirmed by Appellants' expert Prof. Michael Angelina ("Angelina"). Tr. 695: 12-696:20, 1759:13-1761:16. The Tax Court correctly found that the premiums were actuarially determined and Appellee failed to provide any expert testimony properly contradicting that finding. App. [1] 052-056.

## III. Risk Distribution

The Tax Court, relying on both Appellant's expert Angelina and Appellee's expert Dr. Robert Meyer ("Meyer"), found that CFM adequately distributed its risk. App. 035-051. Both experts agreed that sufficient exposure units were present for several of the policies at issue and that risk distribution does not require perfect independence. App. 035-051.

# ARGUMENT

## I. The McCarran-Ferguson Act is Applicable.

Appellants thoroughly addressed the application of the McCarran-Ferguson Act in their Opening Brief. Br. 10-23. However, Appellee's reliance on *Indus. Life Ins. Co. v. United States*, 344 F. Supp. 870 (D.S.C. 1972), *aff'd* 481 F.2d 609 (4th

[1] We cite to Appendix as "App.", the supplemental Appendix as "S. App.", Appellant's opening brief as "Br.", and Appellee's answering brief as "A. Br."

Cir. 1973), requires further analysis. In *Indus. Life*, the Court did not decide if the company was a valid insurance company; instead it decided whether the company's business operations consisted primarily and predominantly of issuing insurance contracts. *Id*. at 877. That the company was licensed and regulated as an insurance company and that it issued contracts of insurance; was undisputed. Instead the question was whether, in light of the company's other activities, that was its primary or predominant business. *Id*. 26 U.S.C. § 831(c) directs us to the provisions of 26 U.S.C. § 816(a) to determine what makes an "insurance company." That section provides that "the term 'insurance company' means any company more than half of the business of which during the taxable year is the issuing of insurance or annuity contracts or the reinsuring of risks underwritten by insurance companies." 26 U.S.C. § 816(a). Determining whether more than half of an insurance company's business is issuing insurance contracts is a different analysis than determining whether the transaction is an insurance transaction.

Here, the Utah Insurance Department determined that CFM was a valid insurance company. The question before the Tax Court should have been whether more than half of CFM's business, as a valid insurance company, was the issuance of insurance contracts. If CFM had other business operations – e.g. real estate investments, rental properties, etc., that made up more than half of its business, then it would not qualify to be taxed as an insurance company. However, that is

not the case. Here, CFM is a licensed and regulated insurance company, and its only business was issuing insurance policies.

## II. The Tax Court Erred in Finding the Transaction Is Not Insurance

### A. Appellee Has Failed to Show Clear Error

Throughout his brief, Appellee erroneously claims that the Tax Court committed clear error in several factual findings. Appellee has failed to meet the rigorous burden to warrant such a finding.

> Under Federal Rule of Civil Procedure 52(a)—which provides that "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witness"—"[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 394–395, 68 S.Ct. 525, 541–542, 92 L.Ed. 746. If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. This is so even when the district court's findings do not rest on credibility determinations, but are based on physical or documentary evidence or inferences from other facts. When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's finding. pp. 1511–1513.

*Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 565 (1985). Many of the factual findings challenged by Appellee were based upon the Tax Court's factual findings from what it deemed credible witness testimony, which demands even greater deference to the Tax Court's findings. This Court should find that Appellee

has failed to meet the standard required to show the Tax Court clearly erred on all accounts.

### B. The Tax Court's "Commonly Accepted Sense" Analysis Does Not Comport with the Seventh Circuit

Appellee wrongly asserts that Appellants did not challenge the framework the Tax Court used. To the contrary, Appellants did precisely that, arguing that the Tax Court departed from Seventh Circuit precedent when it attempted to determine what is insurance. Br. 23-30. In contrast to the Tax Court's inquiry, the Seventh Circuit instructs the appropriate question to ask is whether there is "adequate reason to recharacterize this transaction?" *Sears, Roebuck & Co. v. Commissioner*, 972 F.2d 858, 861 (7th Cir. 1992). The Tax Court's analysis, by contrast, would require CFM to operate flawlessly without making any mistakes, a standard even the largest insurance companies could never meet.

Even though more of the articulated factors weigh in favor of Appellants' valid insurance transaction, the Tax Court rested its contrary determination that the transaction was not insurance on a relatively small number that did not. Br. 26-34. The Tax Court did not follow the Seventh Circuit and failed to consider whether these few factors provided adequate reason to recharacterize this transaction. Instead, the Tax Court held Appellants to an impossible standard that would require insurance companies to not make mistakes, even in the infant stages of their

existence. There can be no logical dispute that there are ambiguities in policy language, imperfect claim administration and issues with timely payment and issuance of policies in the commercial insurance industry. Despite this, none of these factors provide adequate reason to recharacterize the entire transaction, especially in light of the overwhelming evidence that the transaction is a valid insurance transaction.

Appellee additionally conflates the Tax Court's finding regarding Mr. Presta's involvement in the operations of CFM with whether CFM operated as an insurance company. Mr. Presta relied upon Artex to manage the insurance operations of CFM. Ex. 297-J. Artex is a division of Gallagher, which is a global insurance brokerage and risk management services firm that plans, designs and administers a full array of customized, cost-effective property/casualty insurance and risk management programs. Second Stip. ¶¶ 180, 182, Ex. 284-J, p. 1, Tr. 742:20-23. Gallagher reports that it is one of the leading insurance brokerage risk management companies in the world and has received numerous awards including for being most ethical. Second Stip. ¶ 181. In the insurance industry, Gallagher is held to the highest standard. Tr. 781:14-18.

The Tax Court agreed that outsourcing the operations of CFM to Artex does not undercut the operation of an insurance company. App. 062. Instead, the Tax Court determined because Mr. Presta forgot he was appointed the president of

CFM, which is one of 23 or more companies[2] he owns, this fact weighed against Appellants. App. 007-009, 062. This is not an adequate reason to recharacterize this transaction.

Appellee incorrectly asserts that the "record is devoid of evidence that anyone at Caputo's or CFM exercised meaningful oversight over Artex's work." The record is replete with significant evidence disputing this. CFM held annual board meetings that were attended by a representative from Artex, the resident director located in Utah, and enough board members to establish a quorum, among others. Tr. 313:15-314:15, 975:25-976:7; Exs. 542-J, 553-J, 559-J. CFM also held annual meetings of the shareholders. Exs. 540-J, 544-J, 557-J. Each of these meetings was documented with an agenda and minutes. Exs. 539-J – 542-J, 544-J – 550-J, 552-J, 553-J, 554-J, 555-J, 557-J – 560-J, 565-J – 569-J; Third Stip. ¶ 527. CFM also held additional meetings throughout the year, that would include Mr. Scherer (Artex employee), and Mr. Gabinski (commercial insurance broker), when possible, to discuss policies, claims, ideas for the program, and developments at Caputo's. Tr. 313:18-22.

The Court did not clearly err in its finding that CFM exercised adequate due diligence in creating the captive. A. Br. 23. Appellee is again asking this Court to ignore several facts. During 2012, Mr. James Iovino, a Caputo's employee, signed

[2] The Prestas owned 14 real estate companies, eight grocery stores and one insurance company.

an agreement with Artex for a feasibility analysis to be performed by Artex, whereby Artex would evaluate the suitability of a captive for Caputo's. Ex. 250-J. The feasibility study was prepared only after Mr. Presta consulted with Mr. Iovino, his Certified Public Accountants, and his commercial insurance broker Mr. Steve Gabinski. Tr. 971:24-974:14. As a part of the feasibility study preparation, Mr. Jeremy Huish of Artex visited Caputo's Carol Stream location to observe Caputo's operations firsthand. Tr. 972:23-973:9, 745:7-22. Mr. Huish has an LL.M. from Georgetown University and extensive experience in alternative risk management. Tr. 741:12-743:1.

Artex additionally received copies of Caputo's insurance policies from Mr. Gabinski's office. Ex. 252-J, p. 1. Mr. Gabinski also provided Artex with loss data, values of properties, liability schedules, and audits for Caputo's. Tr. 804:9-15. Mr. Gabinski discussed Caputo's commercial insurance program with Artex. Exs. 252-J - 255-J. Artex's underwriting department obtained information about all entities, including revenues, payroll and number of employees, among other information. Ex. 308-J; Tr. 1638:18-1639:12. Artex had a call with Mr. Gabinski to discuss Caputo's business operations. Second Stip. ¶ 256; Ex. 255-J.

After gathering the necessary information and discussing coverage options with Appellants and Mr. Gabinski, Artex prepared a feasibility study that discussed the major concerns about exposures to risks and the potential coverages for these

risks, as well as other information about captive insurance. Tr. 1640:15-1641:10, 1668:18-1669:22; Ex. 292-J. Artex emailed the feasibility study to Mr. Gabinski. Ex. 290-J. Mr. Gabinski sent the feasibility study to Mr. Presta and Mr. Iovino. Ex. 290-J. Mr. Gabinski suggested the addition of employment practices liability coverage to the captive. Exs. 293-J, p. 1, 295-J. Ms. Debbie Inman, Artex's director of underwriting, wanted to ensure that the captive's pricing would be competitive with market. Ex. 298-J, pp. 1-2; Tr. 1683:1-6. While the decision to move forward with the captive insurance transaction was made before the final feasibility study was issued, this was not unusual. The Artex feasibility study's function was to memorialize the parties' understanding, and a client could make a decision to move forward with a captive before completion of the feasibility study because the client would already have a clear picture of the program it would be buying. Tr. 757:25-758:20.

Appellee also mischaracterizes Appellants' need for product recall insurance coverage. The product recall policy covered losses resulting from the recall or withdrawal from the market, or use by any person, of the products prepared or sold by the grocery stores. Exs. 425-J, p. 3, 467-J, p. 3, 496-J, p. 3. Mr. Angelina clearly testified below that the expense of recalling a product would not be covered under any commercial insurance purchased in these cases. Tr. 695: 12-696:20, 1759:13-1761:16. Recall costs are not limited to pulling products off the shelves;

they include contacting customers to bring the already sold products back into the store. Id. For example, the cost of recalling food made by Appellants and sold to their customers containing parsley could be extreme. Tr. 1838:6-16.

### C. The Tax Court Correctly Determined the Premiums were Actuarially Determined

Appellee has not met his burden to show the Tax Court clearly erred in its factual finding that CFM issued policies with actuarially determined premiums. While Appellee cites other Tax Court opinions expressing reservations about the premiums at issue in those cases, this case is not one of them. Appellee thus asks this Court to infer from other Tax Court opinions, without providing the facts leading to the opinions discussed, that Appellant's case must have the same or similar facts. Appellant presents a different set of facts, and on that record, the Tax Court correctly found established that the premiums charged were actuarially determined. App. 052-056.

Appellee later claims that Appellants' diligence in complying with 26 U.S.C. § 831(b), by writing insurance coverage under the $1.2 million allowed by the statute is evidence the premiums are not actuarially determined. However, without presenting a credentialed actuarial expert who actually determined a reasonable premium, such an assertion is unfounded.

Appellee relies heavily on the testimony of Ms. Roberta Garland ("Garland"), an expert retained by Appellee in the Tax Court cases. Appellee ignores the fact that neither Garland nor any other expert retained by Appellee actually calculated any premiums for the policies at issue, let alone what would be a reasonable one. App. 054. Garland admitted that "she had no idea whether 50% or more of the premiums were reasonable because she had not been asked to make any calculations." App. 054.

The Tax Court found that the *only* critique Garland had of Inman's premium analysis was the captive-risk factor ("CRF"), which the Tax Court found to be reasonably used in this case. App. 054. The CRF is used to give the individual insureds a risk grade factor. Tr. 1646:5-10. In order to assess the individual risks of the insured, Inman included in the CRF the following: solvency of the captive (whether there were sufficient assets to pay claims), claims history of the insured, limits on the policy (discontinued in 2014 forward), size of the insured, whether the business was family run (discontinued in 2014 forward), length of time in business and how seasoned was the management, number of products sold in the business, the type of regulatory environment for the insured, geographic location (added in 2016), and geographic spread of risk (correlation). Ex. 571-P, CRF Tab, Columns N through; Tr. 1657:10-1664:2.

The factors are multiplied together and the total CRF is calculated in Column AE of Exhibit 571-P. Ex. 571-P, Column AE; Tr. 1664:3-8.[3] Inman (and other Artex underwriters) determined a CRF of 0.602 for 2012 and 2013 and 0.21 for 2014 and 2015. Ex. 571-P, CRF Tab, Column AE, Rows 5-9. Unlike *Caylor Land*, the CRF used to price the policies here decreased the premium for all taxable years. Ex. 571-P, Policies Tab, Tr. 1665:21-1667:1. *See Caylor Land & Development, et al., v. Commissioner*, T.C. Memo. 2021-30 at [*47][4].

The Tax Court also acknowledged that the *only* calculations done by Garland were a flawed comparison of the rate-on-line of the premiums charged for the commercial policies and the captive policies. App. 054. In fact, Appellee disregarded the rate-on-line analysis of his own expert and performed his own analysis, which the Tax Court correctly rejected. (App. 054). The Tax Court correctly followed *Rent-A-Center v. Commissioner*, in rejecting Appellee's expert's flawed rate-on-line analysis and Appellee's attempt to fix the issue with *his* rate-on-line analysis. 142 T.C. 1, 12 (2014). In *Rent-A-Center* the Court found comparing the premium to surplus ratios of a captive to that of a commercial carrier is inappropriate because the commercial carriers have lower premium to surplus ratios because they face competition – i.e. they have to charge lower

[3] The transcript incorrectly stated "column 80" instead of "column AE."
[4] Appellee in his Answering Brief puts forward two cites for this case, with an inadvertent error appearing on page 47. The correct citation is T.C. Memo. 2021-30, not 2021-31.

premiums. *Id.* The same is true of rate-on-line, which compares the premium to the limits of the policy; a lower premium held down by competition necessarily results in a lower rate-on-line.[5] Appellee's distinction is without a difference.

Appellee here is doing exactly what the Tax Court rejected: attempting to step into the shoes of an expert to conceal the failures of his hired experts and convince this Court that the premiums were not actuarially determined. The Tax Court found the underwriter (Inman) and Appellant's licensed actuarial expert (Rhodes) credibly testified in the case. App. 053-054. Specifically, Rhodes credibly testified that actuaries and underwriters looking at the same data will reach different answers and in some cases those differences can be large. (App. 054). This Court should find that the Tax Court did not clearly err in accepting the credible testimony of Inman and Rhodes that the premiums at issue were actuarially determined.

Appellee has failed to show the Tax Court's factual determinations, which were based upon the deemed credible testimony of underwriter Inman and expert actuary Rhodes, were clearly erroneous.

---

[5] A rate-on-line is calculated by dividing the premium by the limit of liability. Tr. 1386:19-21.

## III. The Tax Court Did Not Clearly Err in Finding CFM Adequately Distributed Its Risks

### A. The Tax Court Did Not Place the Burden of Proof on the IRS

The Tax Court spent 17 pages of the opinion below discussing risk distribution. App. 035-051. The Tax Court analyzed Appellants' experts, Appellee's experts, and the facts presented at trial. The Tax Court did not "misplace[] the burden of proof on the IRS." Instead, the Tax Court found Appellants' expert Prof. Michael Angelina ("Angelina") credibly testified regarding risk distribution and even found Appellee's expert Dr. Robert Meyer ("Meyer") credibly testified under cross-examination regarding risk distribution.

Tax Court Rule 142(a)(1) provides that "the burden of proof shall be upon the petitioner, except as otherwise provided by statute or determined by the Court." Further, 26 U.S.C. § 7491(a)(1) states, "[i]f, in any court proceeding, a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed by subtitle A or B, the Secretary shall have the burden of proof with respect to such issue." The Tax Court does not have to decide whether the burden shifted when both parties offered some admissible evidence. *Blodgett v. Comm'r,* 394 F.3d 1030, 1039 (8th Cir. 2005). Specifically, "[i]n a situation in which both parties have satisfied their burden of production by offering some evidence, then the party supported by the

weight of the evidence will prevail regardless of which party bore the burden of persuasion, proof or preponderance." *Id.*; *see also, e.g., Knudsen v. Comm'r,* 131 T.C. 185, 189 (2008) ("[A]n allocation of the burden of proof is relevant only when there is equal evidence on both sides.... In a case where the standard of proof is preponderance of the evidence and the preponderance of the evidence favors one party, we may decide the case on the weight of the evidence and not on an allocation of the burden of proof."); *Whitehouse Hotel Ltd. P'ship v. Comm'r*, 615 F.3d 321, 332–33 (5th Cir. 2010).

Here, the Tax Court did not impermissibly shift the burden of proof. Instead, the Tax Court found, based upon the record evidence, including testimony from expert witnesses on *both sides*, that there were sufficient independent exposure units for the law of large numbers to apply and to find that the policies issued by CFM sufficiently distributed risk. App. 050.

### B. The Tax Court Did Not Clearly Err in Determining the Number of Exposure Units

Appellee has also not shown the Tax Court clearly erred in its factual findings regarding risk distribution. Perplexingly, Appellee asserts that Appellants did not connect exposures to specific policies. Appellants' expert Angelina wrote a comprehensive expert report connecting exposure units to specific policies. *See* Appellants' Opening U.S Tax Court Brief pp. 119-127. Appellants through cross-examination of Appellee's expert, Meyer, further linked exposure units to policies.

*Id*. Appellants' post-trial U.S. Tax Court brief devoted considerable space highlighting the record evidence of the exposure units for each policy type. *Id*. This allowed the Tax Court to review the exposure units for each policy type in reaching its opinion that risk distribution was satisfied. App. 050.

As clearly articulated by Appellants' expert Angelina, risk distribution need not be satisfied policy by policy; instead, the industry views risk distribution across all policies collectively. Tr. 738:13-739:22. This is true even if the risks being insured are correlated. Tr. 739:7-12. Prof. Angelina opined that based on the exposure units for the collection of policies CFM achieved adequate risk distribution, consistent with insurance industry practice. Ex. 1316-P, pp. 61-62; Tr. 738:13-739:22. Put differently, if you do not have enough apples to insure or you don't have enough oranges to insure, you may have enough if you add the apples and the oranges because you have enough fruit. Tr. 739:17-22. The Tax Court did not clearly err in relying on this expert testimony.

Appellee's attempts to salvage the testimony from Garland on risk distribution should be disregarded. It cannot be ignored that Garland could not identify even a range of exposures sufficient to trigger the law of large numbers for any specific policy. App. 038-039.

Appellee has failed to show that the Tax Court's factual findings, which were based in part on the testimony of Appellee's own expert witness, are clearly erroneous.

**C. The Tax Court Did Not Clearly Err in Determining the Risks were Sufficiently Independent**

As acknowledged by the Tax Court, "perfect independence of risk is not required." *R.V.I. Guaranty Co. & Subsidiaries v. Commissioner*, 145 T.C. 209, 230 (2015). Appellee's own expert, Meyer, agrees that an insurance company can have some correlation and still achieve risk distribution. Tr. 1162:4-9. Meyer testified about several instances in which risks between the policies were not correlated. App. 048. The uncorrelated risks were not just comparing the real estate entities to the grocery stores; there were numerous examples of risks the grocery stores faced that were uncorrelated. Tr. 1161:3-24. Appellee discounts his own expert's testimony as based on "hypotheticals"; however, these are real risks that are covered under the policies at issue and they stand as uncontested examples of how these risks are not correlated.

Appellee correctly states correlation of risk for risk distribution should be from the viewpoint of the insurer not the insured. However, Appellee fails to

acknowledge he conceded that the risks at issue shifted to the insurer (CFM)[6], therefore, viewing the risks insured under the policies is from the point of the insurer.

Appellee, ignoring the testimony of his own expert (Meyer), again attempts to step into the shoes of an expert and explain, why *he* believes there is correlation of risk. The Tax Court disregarded Appellee's attempt to do so and found that Appellee's own expert credibly testified that the risks were uncorrelated enough to achieve adequate risk distribution here. This Court should do the same because Appellee has not shown this finding is clearly erroneous.

## IV. The Tax Court Incorrectly Refused to Recharacterize the Premiums as Capital Contributions or Loss Reserves/Deposit

Appellee is asking this Court to subject Appellants to double taxation (likely triple taxation) resulting from treating half of the transaction at-issue as worth $0 and the other half of the same transaction is worth $4,793,443.[7] The first layer of tax stems from disallowing the deduction for the insurance premiums paid, the second layer of tax comes from taxing the premiums paid to the insurance company, CFM, even though the Tax Court found the transaction was not insurance. A third layer of tax applies when CFM pays dividends or distributes its

---

[6] App. 035.

[7] The premiums at issue are $1,199,136, $1,199,136, $1,196,148 and $1,199,023 for the 2012, 2013, 2014 and 2015 tax years, respectively. Br. 7.

assets to the Prestas. This is at best a significantly inequitable result and at worst a gross misapplication of the law.

Appellee is asking this Court to ignore the long-standing symmetrical treatment of deductions and income as well as congressional intent behind taxation of insurance companies. *See Sharp v. Commissioner*, 75 T.C. 32, 35 (1980) (determining taxpayer does not have interest income when former husband is not allowed corresponding interest expense deduction).

### A. The Form of the Transaction Allows for a Finding to Avoid Double Taxation

At the outset it is important to recall that it is Appellee who asserts the transaction is not insurance, not Appellants. Accordingly, Appellee's reliance on *Complex Media, Inc. v. Commissioner*, T.C. Memo. 2021-14, is misplaced. Appellee ignores the salient fact that *Complex Media* involved a taxpayer arguing against the form of its own transaction in order to get tax benefits inconsistent with (i.e., more favorable than) the tax benefits obtained by following the form of the transaction. *See Complex Media, Inc.*, T.C. Memo. 2021-14, *48, *64. The recharacterizations that Appellants are arguing for, if the Court determines the transaction is not one of insurance, all have tax benefits that are consistent with the benefits if the form were respected. The recharacterization is also consistent with Appellee's own Revenue Rulings.

Appellee admits in his own Revenue Rulings, these transactions, if they are not insurance they are either indemnification or loss reserve, deposit, loan, or capital contribution. Rev. Rul. 2005-40, *see* Br. 42-48. The form of the transaction is not disturbed when following the Revenue Ruling, only the characterization that the payments are for insurance premiums.

Appellee's reliance on *Estate of Stuller v. U.S.*, 811 F.3d 890 (7th Cir. 2016) is misplaced. First, *Estate of Stuller* is a case involving whether a transaction is a for profit activity under 26 U.S.C. § 183. Under Section 183, for transactions not engaged in for profit, deductions are allowed up to the amount of income reported. *Id*. Accordingly, the deduction was not disallowed, the resulting loss was. The result was that there is no asymmetry between taxpayers. Furthermore, in *Estate of Stuller*, it was the taxpayers who requested the Court remove income reported for the rents received by the S Corporation. 811 F.3d at 899-900. Here, it is Appellee who is asking the Court to recharacterize the transaction and include as income the premiums received by CFM. In *Estate of Stuller*, there is no dispute the amounts received by the S corporation were rents. Here, it remains unknown what type of income the funds CFM received would constitute, if they are not insurance premiums.

Notably, Appellee failed to address *Massachusetts Protective Association v. United States*, 114 F.2d 304 (1940), where the Tax Court's recognition that the

"inclusion (of premium income) in gross income is only justified by the deductions allowed." (Referencing Hearings before the Committee on Ways and Means on the Revenue Act of 1918, 65th Cong., 2d Sess. Pt. 1 (1918), 811). *See also Bituminous Cas. Corp. v. Commissioner*, 57 T.C. 58, 78 (1971). This symmetry of taxation for insurance-related transactions has been acknowledged by the Fourth and Eighth Circuits as well. *See United Ben. Life Ins. Co. v. McCrory*, 414 F.2d 928, 933 (8th Cir. 1969) *Early v. Lawyers Title Ins. Corp.,* 132 F.2d 42, 45 (4th Cir. 1942).

### B. Insurance Premiums that are Deemed Not Insurance are Capital Contributions or Loss Reserves/Deposit

Appellee asks this Court to not follow *Chapman Glen* 140 T.C. 294, 350 (2013), and asks it to instead follow *Reserve Mechanical* and *Syzygy* as it relates to the treatment of insurance premiums that are deemed not insurance – that is, whether such payments are capital contributions to the captive or instead taxable income. *Reserve Mech. Corp. v. Commissioner*, T.C. Memo. 2018-86 (2018), *aff'd* 34 F.4th 881 (10th Cir. 2022), *Syzygy Ins. Co. v. Commissioner*, T.C. Memo. 2019-34. Unlike the taxpayers in *Reserve Mechanical* and *Syzygy*, here Appellants provided evidence that their intention was to set aside funds to pay for catastrophic losses. This outcome is consistent with the testimony of Mr. Presta and Mr. Goldenhersh, CFM's financial statement auditor. Mr. Presta testified as such in the proceedings below. Tr. 997:2-10. Mr. Goldenhersh testified that an insurance transaction not meeting

the requirements for insurance would be reclassified as a deposit arrangement. Tr. 600:10-23. This treatment is consistent with numerous opinions determining the proper treatment of transactions that are not insurance for federal income tax purposes. As the Sixth Circuit Court of Appeals pointed out in *Humana*, there was no error, of fact or law, in the Tax Court's reasoning below, that payments made to a captive insurance company as premiums were merely additions to a self-insured reserve for losses and nondeductible under the Code. *Humana Inc. v. Commissioner*, 881 F.2d 247, 251-52 (6th Cir. 1989) (citing *Stearns-Roger Corp. v. United States*, 774 F.2d 414, 415 (10th Cir. 1985)). *See also Mobil Oil Corp. v. United States*, 8 Cl. Ct. 555, 567 (1985); *Steere Tank Lines, Inc. v. United States*, 577 F.2d 279, 280 (5th Cir. 1978); *Spring Canyon Coal v. Commissioner*, 43 F.2d 78 (10th Cir. 1930); Rev. Rul. 2005-40, 2005-27 I.R.B. 4; Rev. Rul. 2008-8, 2008-5 I.R.B. 340. Appellee's position produces the opposite result; Caputo's is denied any deduction for the payments while CFM is taxed on the very same dollars as income. Not one of these opinions resulted in double or triple taxation. Importantly, the Tenth Circuit in *Reserve* acknowledged that the premiums were deducted by the insured entities. *Reserve*, 34 F.4th at 919. Therefore, it did not result in double (plus) taxation.

Furthermore, in *Kohler Co. v. United States*, the Seventh Circuit explained that arbitrary and extravagant assessments require the IRS to present some evidence in support thereof, as in the case of a naked assessment. 468 F.3d 1032,

1036 (7th Cir. 2006). Appellee's bare assertion that taxpayers are taxed on all income from whatever source derived does not satisfy that requirement. The Tax Court recognized many years ago, that the taxation of income requires keeping basic principles in mind, such that tax is imposed on income and not on "every conceivable type of receipt." *Pittsburgh Milk Co. v. Commissioner*, 26 T.C. 707, 715 (1956). Appellee has failed to identify what income CFM has supposedly earned.

To the contrary, Appellants presented several witnesses at trial, all familiar with CFM's operations, from its captive manager to its state regulator, who testified—consistently—that CFM had no operations other than insurance. Namely, CFM was formed to protect the family's business and the Caputo's name, in particular, from situations like the one Iwan's Deli faced. Ex. 950-J; Tr. 970:18-25, 897:19-25. According to Mr. Presta, and consistent with CFM's bank statements and financial records, the payments from Caputo's, in the amounts of $1,199,136, $1,199,136, $1,196,148, and $1,199,023 in the 2012, 2013, 2014 and 2015 tax years, respectively, were for insurance policies and no other purpose. Tr. 989:9-25. Mr. Presta confirmed that, aside from insurance in 2012 through 2015, CFM did not engage in any other business or income-producing activities. Tr. 990:1-10.[8] Mr.

[8] The trial transcript at 990:6 reflects "did CFM engage in any other *busy* activities" which should read "did CFM engage in any other *business* activities." (emphasis added).

Presta also confirmed that in 2012 through 2015, aside from insurance, CFM did not receive any compensation or commissions for services, fringe benefits, or partnerships. Tr. 990:8-22. CFM also did not receive any interest income, rental income, royalty income, dividend income, income from life insurance, income from endowment contracts, pension income, income from discharge of indebtedness, income in respect of a decedent, income from an estate or trust, or any other income. Tr. 990:8-992:17.

These witnesses also confirmed that CFM did not receive any of the items specifically enumerated in 26 U.S.C. § 61, such as rents, royalties, or anything else. Mr. Scherer, an Artex employee also affirmed that in 2012 through 2015, aside from insurance activities, CFM did not have any other business or income-producing activities. Tr. 327:7-20. Mr. Scherer was not aware of any other source of income for CFM in 2012 through 2015, including compensation or commission for services, fringe benefits, compensation from partnerships, interest income, rental income, royalties, dividends, annuities, income from life insurance, income from endowment contracts, income from pensions, income from discharge of indebtedness, income in respect of a decedent, income from an estate, or any other income. Tr. 327:21-330:1.

Mr. Weideman, a representative of the Utah Insurance Department, was also unaware of any income-producing activities CFM had engaged in, other than insurance activities, during the 2012 through 2015 tax years. Tr. 255:16-22. Mr.

Goldenhersh was likewise unaware of any business activities or income-producing activities other than insurance that CFM was involved in during the 2014 and 2015 tax years. Tr. 626:17-23.

Appellee did not contest or rebut this evidence; instead, he simply argues CFM is taxed on every conceivable receipt of funds. This case is no different than *Chapman Glen*. In *Chapman Glen*, the Court agreed that if the amounts paid to the insurance company were not insurance, then they were capital contributions. *Chapman Glen Ltd. v. Commissioner*, 140 T.C. 294, 350 (2013). Appellee wrongly claims that the Court "sanctioned" the IRS with this result because the IRS made an untimely argument that the premiums were rental income. A. Br. 60. This argument is not supported by the Tax Court's opinion. While the Tax Court correctly refused to consider a late argument, the Tax Court did not indicate in any way that the decision to treat the premium payments as capital contributions was a sanction for this action. *Id*. The capital contribution treatment was simply the correct result. At least in *Chapman Glen* the IRS provided an explanation as to what type of income the insurance company allegedly received, if the payments were not insurance. Here, Appellee wrongly asserts only that the payments are income from whatever source derived, without identifying what that income is or offering any further support for his position.

### C. The Tax Court Did Not Find the Transaction Lacked Economic Substance, But Such a Finding Would Provide a More Favorable Result to Appellants

Unlike in every case cited by Appellee, in this case, the Tax Court here refused to find that the transaction before the Court lacked economic substance. Appellee's attempt to convince this Court now that the transaction lacks economic substance should be rejected. The Tax Court refused to even uphold a negligence penalty against Appellants. If the Court determined the transaction lacked economic substance, that would negate Appellants' reasonable cause defense to the penalties asserted in the case, which requires a showing that they acted in good faith. *Whitsett v. Commissioner,* T.C. Memo. 2017-100, at *12. The Tax Court found, and Appellee does not dispute, that Appellants acted in good faith in entering into the insurance transaction. App. 067-069.

Appellee cites a Tax Court order from a different Tax Court case seemingly to support his position on brief. However, Tax Court Orders are not treated as precedent. Tax Court Rule 50(f). Appellee attempts to distinguish the clear Tax Court opinions finding that if a *transaction* lacks economic substance, the entire *transaction* must be unwound, by claiming the cases cited by Appellants only involve one taxpayer. Appellee's argument is fundamentally flawed. The Tax Court did not reference or qualify its opinion to apply only to transactions involving one taxpayer. To the contrary, the Tax Court held that it is the *transaction*

- not the *taxpayer* - that must lack economic substance, and where it does the entire *transaction* must be unwound. *See Bank of N.Y. Mellon Corp. v. Commissioner*, T.C. Memo. 2013-225 at *13-14; *Sheldon v.* Commissioner, 94 T.C. 738, 762 (1990); *Arrowhead Mountain Getaway, Ltd., v. Commissioner*, T.C. Memo. 1995-54 at *20. Further, the Tax Court found in *Arrowhead Mountain Getaway*, that there was no partnership income from the transactions with the limited partners because the transactions were shams. T.C. Memo. 1995-54 at *20. A partnership and its partners are clearly two separate taxpayers.

If the transaction is not insurance for federal income tax purposes, the entire transaction should not be insurance for federal income tax purposes. Asserting income to CFM when the corresponding deductions are disallowed without any explanation as to what goods or services were provided by CFM warranting income treatment is a punitive result; not contemplated by the Code or by congressional intent regarding taxation of insurance transactions. Appellants are simply asking for symmetrical treatment for the entire transaction.

**CONCLUSION**

Here, there is not adequate reason to recharacterize the transaction before the Court. Consistent with the determination of the Utah Insurance Department, the transaction before the Court is a valid insurance transaction and should be respected as such. If the Court determines the transaction is not insurance, this

Court should correct the Tax Court's erroneous determination that CFM is required to pay tax on the insurance premiums it received. The double taxation result is inequitable and not supported by law. Additionally, Caputo's New Farm is entitled to reduce its taxable income by the claimed reimbursements that were reported as income or reduced expenses in the 2014 and 2015 tax years.

DATED this 26th of August 2026.

By: /s/ Kacie N.C. Dillon
KACIE N.C. DILLON
7033 E. Greenway Parkway
Suite 200
Scottsdale, AZ 85254
Phone: (480) 429-3360
Facsimile: (480) 429-3362
Counsel for Appellants

By: /s/ Brian D. Plaut
BRIAN D. PLAUT
7676 Hazard Center Drive
Suite 1525
San Diego, CA 92108
Phone: (619) 387-3790
Facsimile: (480) 429-3362
Counsel for Appellants

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Circuit Rule 32(c) because it contains 6,289 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared using Microsoft Word for Office 365 in Times New Roman 14-point font, a proportionally spaced typeface.

DATED this 26th of August 2026.

By: /s/ Kacie N.C. Dillon
KACIE N.C. DILLON
7033 E. Greenway Parkway
Suite 200
Scottsdale, AZ 85254
Phone: (480) 429-3360
Facsimile: (480) 429-3362
Counsel for Appellants